Filed 10/26/15  P. v. Guillory CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066228 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD243864) |
| JEMERE GUILLORY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Jemere Guillory guilty of the lesser included offense[1] of simple mayhem (Pen. Code, § 203; count 1); assault with a firearm (Pen. Code, § 245, subd. (a)(2); count 2); possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); counts 3 & 4); possession of cocaine base for sale (Health & Saf. Code, § 11351.5; count 5); receiving or acquiring proceeds over $25,000 known to be derived from the unlawful sale of controlled substances (Health & Saf. Code, § 11370.9, subd. (a); count 6); possession for sale of a controlled substance (Oxycodone) (Health & Saf. Code, § 11351; count 7); possession for sale of a controlled substance (methamphetamine) (Health & Saf. Code, § 11378; count 8); and possession for sale of a controlled substance (Diazepam) (Health & Saf. Code, § 11375, subd. (b)(1); count 10).

As to count 1, the jury made a true finding that defendant personally used a firearm (i.e., a handgun) (Pen. Code, § 12022.5, subds. (a) & (b)), personally discharged a firearm (Pen. Code, § 12022.53, subd. (c)) and personally discharged a firearm causing great bodily injury (Pen. Code, § 12022.53, subd. (d)). As to count 2, the jury found true defendant personally used a firearm (Pen. Code, § 12022.5, subd. (a)) and personally inflicted great bodily harm on the victim (Pen. Code, § 12022.7, subd. (a)). As to all of the offenses for possession of drugs for sale, the jury found true defendant committed the crimes for the benefit of, or in association with, a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)). As to count 5, possession of cocaine base for sale, the jury found

---

[1] The jury found defendant not guilty of aggravated mayhem (Pen. Code, § 205) and attempted aggravated mayhem (*Id.*, §§ 205 & 664).

2

true defendant possessed a quantity greater than one kilogram in weight (Health & Saf. Code, § 11370.4, subd. (a)(1)).

Defendant subsequently admitted suffering a qualifying prior narcotics conviction (Health & Saf. Code, § 11370.4, subds. (a), (b) & (c)) and two prison priors (Pen. Code, § 667.5, subd. (b)).[2] The court sentenced defendant to 25 years to life, plus 29 years eight months in state prison.

FACTUAL OVERVIEW

*Prosecution Evidence*

In late May 2012, a shooting occurred around 9:30 p.m. outside a market located in Southeast San Diego. Video from surveillance cameras located both inside and outside the market showed a man, later identified as defendant, and a female, later identified as defendant's girlfriend Kitsana Xaypanya, inside the market arguing with a man, later identified as victim James Muhammed, shortly before the shooting. Next, the video showed the victim, defendant and Xaypanya leaving the market, a "flash of light" in the darkness shortly thereafter and people in the market's parking lot "duck[ing] down" as if they were "startled" by a noise. After numerous failed attempts to obtain a copy of the video, police took "still pictures" from the video of the victim, defendant and Xaypanya.

Xaypanya, who was given a grant of immunity, testified a man later identified as the victim touched her "booty" inside the market and said, " 'Hey, yo mama.' " In response, Xaypanya and defendant began to argue with the man. Xaypanya said the man

---

[2]    Unless otherwise noted, all further statutory references are to the Penal Code.

3

followed them outside and across a street. Although she was at the scene of the shooting and heard at least one gunshot, Xaypanya told the jury she (allegedly) did not see the shooter.

San Diego Police Detective Daniel Brinkerhoff testified he interviewed the victim a few days after the shooting. The victim at that time was relatively cooperative. The victim told Brinkerhoff he argued inside a market with an African-American male, later identified by others as defendant, and a Samoan female, later identified as Xaypanya. The victim admitted he disrespected the female but told the detective he apologized. Still upset, the African-American male asked the victim to step outside. The victim believed they were going to fight. The victim followed the two across the street. The African-American male, however, turned and faced the victim, pulled out a gun and shot the victim in the thigh. The victim told the detective he could identify the shooter but did not then do so, stating he was unsure whether he wanted the case prosecuted.

Witness Rommel Pacho testified at the time of the shooting he lived near the market. Around 9:30 p.m. on the night of the shooting, as he was leaving his home, Pacho heard loud voices and what appeared to be an argument across the street, near the market. Pacho saw a couple being followed by another man. They were talking back and forth. Shortly after they walked past Pacho, he heard a single gunshot but did not see the actual shooting. A man turned toward Pacho, yelled he had been shot and asked Pacho to call 911. The man told Pacho he had been shot by the other man, who was with a girl Pacho described as "Asian" looking.

4

Witness Guilford Hawkins testified he was at a grocery store adjacent to the market on the night of the shooting. Hawkins saw two males and one female arguing outside the market. Hawkins later identified Xaypanya as the female from a photographic lineup. He stopped to see what was going on and heard an Asian female telling a man more than once, " 'Keep it up, um, we'll see what happens,' " as the man continued to talk to the female. The man with the female, whom Hawkins described as the shooter, kept telling the female, " 'Let's go. Let's go,' " but the female continued to argue with the man, who was following behind the couple.

As the man followed the couple across the street, Hawkins saw the man with the female turn around, raise a gun and saw the "muzzle flash from the gun." Hawkins next saw the man who had been following the couple "hop away." Hawkins heard the female tell the man, " 'See? I told you. I told you.' " Hawkins next heard the shooter say to his female companion, " 'Let's go' " and saw the couple walk "casually away." Hawkins called 911. Hawkins testified the shooter was wearing red basketball shorts and a black fleece jacket with gray stripes that looked similar to the clothes later recovered from defendant's home.

Witness Trazel Metters testified on the night of the shooting he was working as a security guard in an apartment complex near the market. Around 9:30 p.m., Metters heard a gunshot. About three to five minutes later, Metters saw a male and female walk past him. A few weeks after the shooting, a police officer showed Metters a photograph, and Metters identified the man in the photograph as the same man he had seen walking past him with the female shortly after the shooting.

Using still images from the market's surveillance video, the police created a flier of the suspect in the shooting. A member of the police's gang task force subsequently recognized the suspect in the flyer as defendant. Police arrested defendant during a traffic stop. Police found a house key on defendant's car key ring.

As discussed in more detail *post*, before obtaining a search warrant the police went to defendant's mother's home, where they believed defendant lived, and conducted a preliminary search to secure it pending issuance of a warrant. After the warrant issued later that night, police searched the home and found in an upstairs bedroom paperwork belonging to defendant. In that bedroom, the police also found among other items a .40-caliber handgun and magazine with eight rounds inside; long red shorts, a black jacket with gray stripes and shoes, all of which were similar to those worn by the suspect as seen on the surveillance video; photos of defendant; two digital scales with off-white residue on them, along with two razors; a locked safe; a box of plastic baggies; jail mail from Xaypanya addressed to defendant; and two Pyrex glass cooking dishes, both with off-white residue on them.

In a downstairs closet, police found a .45-caliber semiautomatic handgun with three extended magazines for the gun, two of which were loaded; a 12-gauge shotgun inside a brown case; a 700 rifle with a scope and tripod and 10 rounds of ammunition inside a case; a 20/06 rifle with a scope in a black soft case; one box of nine-millimeter ammunition; and four other boxes of ammunition.

After an additional search warrant issued, police opened the safe and inside they found a .32-caliber revolver along with six rounds of ammunition; an ExtenZe package

6

with four tablets missing; a full unopened package of ExtenZe; 92 five-milligram Oxycodone tablets; 100 Oxycodone tablets; a counterfeit $20 bill; two credit cards belonging to a third party; 9.46 grams of methamphetamine; almost four pounds of cocaine base; and about $28,500 in cash, separated in small stacks and bundled with black rubber bands.

Several days later, police again searched defendant's home pursuant to a search warrant.  In this subsequent search, they found defendant's California identification card in a downstairs closet.  In an upstairs bedroom, police found 18 boxes of sandwich baggies; four bags of black rubber bands similar to the rubber bands used to bundle the cash police already had found; razor blades, including one with cocaine residue; two scales; a pocket scale with cocaine residue on it; and a 100-gram weight to calibrate the scales.

Defendant's fingerprints were later found to be on the package of ExtenZe tablets recovered from the safe.  DNA recovered from the surface of the .45-caliber semiautomatic handgun found in the downstairs closet matched defendant.

San Diego Police Detective Juan Cisneros, a narcotics expert, testified that the amount of cocaine base recovered from the safe in the upstairs bedroom would be worth about $70,000 if sold by the pound and would be worth more if sold in smaller quantities. In light of the scales, razor blades, sandwich baggies, the cash, and baking dishes, some of which items contained cocaine residue, and in light of the amount of cocaine base and other drugs recovered from the safe, Cisneros opined that a person in possession of such items did so for the purpose of sale.

San Diego Police Detective David Collins, a gang expert, testified he is familiar with the 5/9 Brims street gang. In October 2012, Collins opined that there were about 200 documented members of that gang; that their territory included parts of Southeast San Diego; that members of the gang often had a 5-9 or O-V tattoo; that gang members of 5/9 Brims celebrate May 9 (i.e., 5/9) as a holiday and throw a big party within the gang's territory; and that the 5/9 Brims' main rival was the Neighborhood Crips gang and to a lesser extent, the West Coast Crips.

Based on his own investigation, the investigation and police reports of others and the execution of search warrants on some of the gang members' homes, Collins opined that 5/9 Brims qualified as a criminal street gang under the law because the gang had a common sign, symbol or place; members that commonly or continually associated; and the gang's primary activities included murder, robbery, weapons, assaults, narcotics and narcotics for sale. Collins reviewed specific instances of gang activity to show that members of 5/9 Brims engaged in a pattern of criminal activity as defined under the law.

Collins opined that defendant at all times relevant was an active member of the 5/9 Brims gang. Collins based his opinion on many factors including that defendant went by the moniker " 'J Hog' "; that defendant had a large "pig" or "wild boar" tattooed on his back; and that defendant previously admitted to police he was a member of 5/9 Brims and also was known to associate with other members of that gang. Collins further opined that a 5/9 Brims gang member in possession of the weapons and drugs like those found in defendant's mother's home would possess such items for the benefit of the gang, with the

8

specific intent to promote, further or assist in criminal activities by the gang and/or its members.

*Defense Evidence*

Defendant testified in his own defense. He admitted to being a member of 5/9 Brims. He stated Brims stood for "Black Revolutionary Independent Movement Soldier." Defendant acknowledged he confronted the man later identified as the victim inside the market after the victim inappropriately touched his then girlfriend, Xaypanya. Defendant previously had seen the victim in the neighborhood. Defendant encouraged Xaypanya to stop arguing with the victim and to leave the store. Defendant also told the victim he should apologize to Xaypanya. After defendant and Xaypanya left the store, the victim followed behind them and according to defendant, continued to be confrontational with Xaypanya.

Defendant testified he asked the victim to leave them alone. Instead, the victim made threatening remarks as he was following behind defendant and Xaypanya, saying, " 'I'm going to show you something. I've got something.' " Defendant next saw the victim reach under his shirt as he continued to make such threats. Because defendant believed that the victim was reaching for a weapon, defendant testified he and Xaypanya began running. Shortly thereafter, defendant heard a gunshot and realized the victim had been hit.

Defendant denied carrying a gun on the night of the shooting and also denied then owning a gun. Defendant testified that neither the guns nor drugs found by police in his mother's home belonged to him. He also testified that he did not live with his mother.

9

On cross-examination, defendant denied having a key to his mother's home on his car key ring when he was arrested. Defendant said the key to his mother's house was "added" to the ring postarrest.

DISCUSSION

A. *Right to a Public Trial*

1. Additional Background

Before a jury was empanelled in this case, the record shows the following exchange took place between defense counsel and the court concerning defendant's family members and their attendance in the courtroom:

"[Defense counsel]: Your Honor, just so you know, too, your bailiff has been so -- so kind to allow family members of my client to come in previously. I'm going to hope that there will be no future issue at all.

"THE COURT: Well . . . first of all, during the jury selection, we're just not going to have room for them because the court is going to be full of prospective jurors. But once -- certainly once we get the jury selected, they'll be free to be here. As long as -- I think the bailiff did have a little -- had to talk a little bit with one of the family members the other day. But I think hopefully that was effective and that won't be -- won't be a problem. [¶] But, no, same rule. As long as they follow the rules and don't cause any problem, they're welcome to be here. I say, not during the jury selection because we just don't have room for them."

The record shows at 11:34 a.m., 60 potential jurors entered the courtroom. After being admonished, the jurors were excused at 12:01 p.m. At 1:34 p.m., the court

10

reconvened, read the charging portion of the information and pre-instructed the prospective jurors in the law applicable to this case. Voir dire then began until 3:00 p.m., when the court was again in recess. The court reconvened at 3:17 p.m. and voir dire continued until 4:08 p.m., when the prospective jurors were admonished and excused for the day.

The record shows the following day voir dire did not resume until 9:59 a.m. At 10:59 a.m., the prospective jurors were excused while the court conducted individual voir dire of three prospective jurors. At 11:11 a.m., upon the court's inquiry, the bailiff informed the court and counsel of a "disruption in the audience." The record does not explain the nature of the disruption. However, when the court reconvened at 11:27 a.m., it admonished the prospective jurors not to speak with anyone, stating as follows:

"Continue to abide by the admonitions not to talk to anyone else under any circumstances; allow anyone to talk to you about the case itself; not to seek any information from any outside sources, electronic, social media, written sources; talking to anybody, whatever those sources might be about any matter related to the case; and, maintain your distance.

"*There are some folks here who have an interest in the case.* And they have a right to be here in or about the courtroom. But I think you recognize who they are. And don't have any contact with them. Don't let them have any contact with you. I'm not suggesting they [don't] have a right to be here and they haven't done anything improper. But just to maintain some distance from them so you don't inadvertently overhear what

11

they might be discussing which may have something to do with the case or [defendant] but won't be any part of the evidence upon which you have to base your finding.

"So think about serving as a juror. Think about what we're talking about here. But keep those thoughts to yourselves."

The record shows that the prospective jurors were admonished and excused at 11:45 a.m.; that the court ruled on two motions and went into recess at 12:04 p.m.; that the court reconvened at 1:38 p.m.; and that a jury was selected by 3:04 p.m.

2. <u>Governing Law and Analysis</u>

A criminal defendant has a constitutional right to "a trial which is open to the general public at all times." (*People v. Woodward* (1992) 4 Cal.4th 376, 382 (*Woodward*).) The public, too, has a right to an open trial. (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 552.) Openness "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." (*Press–Enterprise Co. v. Superior Court of Cal.* (1984) 464 U.S. 501, 508.) A public trial helps keep the court and the triers of fact " 'keenly alive to a sense of their responsibility and to the importance of their functions' " and may also discourage witnesses from committing perjury. (*Woodward*, at p. 385.) The public trial right applies not only to the trial itself, but also to many other court proceedings including, as relevant here, voir dire. (See *Presley v. Georgia* (2010) 558 U.S. 209, 213.)

The record is silent regarding whether defendant's family members were in fact excluded from the courtroom during any part of voir dire. The record suggests that at least with respect to the second day of voir dire, there were people with an "interest" in

12

the case present in the courtroom. However, it is not clear whether these "interest[ed]" people were defendant's family members.

Moreover, the record also is silent regarding whether there was room for any or all of defendant's family members when the 60 prospective jurors initially entered the courtroom and voir dire first began, or the following day as voir dire continued, when prospective jurors were excused throughout the day and when a jury was seated at 3:04 p.m. We note that *if* defendant's family members were excluded from the courtroom for a short period of time in order to make room for prospective jurors but subsequently were able to reenter—perhaps after a recess, then defendant's right to a public trial under those circumstances *may* not have been violated. (See *People v. Bui* (2010) 183 Cal.App.4th 675, 680 [holding the temporary exclusion of three individuals for about 40 minutes, "during only a small part of the voir dire of prospective jurors, and not during the evidentiary phase of the trial," was de minimis and thus did not violate a defendant's public trial right]; see also *Owens v. United States.* (1st Cir. 2007) 483 F.3d 48, 62, 66 [concluding the court erred in not holding an evidentiary hearing on the defendant's claim he was denied a right to a public trial when two of his family members submitted *affidavits* stating they were prohibited from entering the courtroom during voir dire, after the record showed the courtroom was cleared of all spectators to accommodate 72 prospective jurors, and further concluding the absence of any findings made it impossible to discern whether it was necessary for the courtroom to be cleared to permit the entire jury pool to enter and/or whether members of the public, including the defendant's family

members, were allowed to reenter the courtroom as seats opened up once potential jurors were excused].)

Given the lack of any evidence in the record to support defendant's contention that his family members were actually excluded from the courtroom during voir dire or that their exclusion was not de minimis, on this record we reject defendant's contention he was deprived of the right to a public trial by the alleged exclusion of his family members from the courtroom.[3]

B. *Motion to Suppress*

1. Additional Background

As noted, after defendant was arrested in mid-October 2012 police went to the home of defendant's mother, where they believed defendant lived and where they had just seen defendant leave shortly before his arrest. Police used a key found on defendant's key ring to open the home and conduct a "security sweep." Police sought and obtained later that night a search warrant of the home.

At the hearing on the motion, the court found that even if the security sweep was not justified, the subsequently obtained search warrant was valid because the probable cause finding to support its issuance "arose from a video as well as subsequent investigations that took place as well as the watching, based on surveillance, of [defendant] leave this house . . . ." In denying the motion to suppress, the court noted

---

[3]    Given our decision, we deem it unnecessary to resolve the People's alternate contention that defendant forfeited his right to challenge this issue because he acquiesced in the court's suggestion that his family members allegedly be excluded from the courtroom to make room for the 60 prospective jurors.

14

there was a reference in the affidavit to men's clothing and to 5/9 Brims based on color, but the court found this reference was not material on the issue of probable cause.

The court also noted that the items they would be searching for included items that may have been identified during the initial security sweep, including guns and ammunition. The court, however, found that all such items were "consistent with the grounds for the probable cause based on the shooting and the video that occurred prior to the illegal search." The court thus found that even if the initial security sweep of the home was illegal, the evidence used in support of the affidavit to obtain the search warrant was obtained independently, namely from the market surveillance video and from the police's subsequent investigation of the shooting.

2. Governing Law and Analysis

Here, defendant contends that absent the fruit of the alleged unlawful security sweep of his mother's home, the affidavit is insufficient to support a finding of probable cause to justify issuing the search warrant. The People agree with defendant that the affidavit contains information both obtained by the alleged illegal security sweep as well as untainted information. Both parties also agree the "independent source rule" applies here and requires a two-prong test, but they disagree on the outcome of that test.

"It has long been established that even if a criminal investigation involved some illegal conduct, courts will admit evidence derived from an 'independent source.' " (*People v. Weiss* (1999) 20 Cal.4th 1073, 1077 (*Weiss*), quoting *Silverthorne Lumber Co. v. United States* (1920) 251 U.S. 385, 392.) "In a case involving the inevitable discovery rule, a close relative of the independent source doctrine, the United States Supreme Court

15

explained the basis for admitting evidence derived from a source independent of illegal conduct.  'The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections.  This Court has accepted the argument that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes.  On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.

" 'By contrast, the derivative evidence analysis ensures that the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct.  The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation . . . .  The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.  [Citations.]  When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.' "  (*Weiss*, *supra*, 20 Cal.4th at pp. 1077-1078, quoting *Nix v. Williams* (1984) 467 U.S. 431, 442-443.)

Where the affidavit supporting a search warrant contains both information obtained by alleged unlawful conduct as well as untainted information, as noted a two-prong test applies to justify application of the independent source doctrine. (*Weiss*, *supra*, 20 Cal.4th at pp. 1078, 1082.) First, the affidavit, excised of any illegally obtained information, must be sufficient to establish probable cause. (*Id.* at p. 1082.) Second, the evidence must support a finding that "the police subjectively would have sought the warrant even without the illegal conduct." (*Id.* at p. 1079; see *id.* at p. 1082 [" 'if the application contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, provided that the officers were not prompted to obtain the warrant by what they observed during the initial entry' "].)

Finally, the "standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

Turning to the first prong, the affiant, Detective Collins, detailed the investigation the police had conducted of the shooting of the victim. Collins noted that witnesses in the area reported the victim, who was known by the officer who initially responded to the incident, "was shot by an unknown black male. Officer Schmidt [i.e., the responding officer] examined [the victim's] injuries and saw only one gunshot wound to the leg. Paramedics arrived on scene, transported him to [the hospital] for treatment, and while at

17

the hospital, Officer Schmidt documented [the victim's] injuries. A subsequent follow-up ultimately led to Detective Brinkerhoff . . . collecting video surveillance at [the market]. That information was originally relayed in Officer Ketcham['s] . . . report. The victim was inside the store when he was confronted by an unknown black male who was ultimately identified as [defendant]. [Defendant was] inside of the store with his long term girlfriend which will be Kitsana Xaypanya . . . . The two of them were inside of the store. Kitsana believed that she is disrespected by the victim . . . . [Defendant] steps in, they get into a verbal argument . . . the exchange actually leads to them leaving the store. As they leave the store, the victim believes that the -- they're going outside simply for a physical altercation. They walk out of the front of the store. The scene on the video is they walk out. Just as they get out of the area where the camera lighting picks up, Detective Brinkerhoff noticed that there was one flash that he believes to be the gunshot. From that point, the victim -- or the suspects continued westbound which is actually back in the direction of the house that we wish to -- wish to search and . . . the victim was contacted and transported to the hospital."

Collins also stated in support of the affidavit that defendant lived about a half mile from the location of the shooting and that police wanted to conduct the search then, late at night, because defendant was a known member of the 5/9 Brims gang and thus could arrange to have other gang members and/or their families remove any evidence from the home.

The record shows Collins stated in support of the affidavit that the home had been secured and that two uniformed officers were currently at the residence. The judge next

18

asked who lived there at the residence and whether there were any children in the residence. In response, Collins stated, "No. We . . . on the cursory, when we cleared the -- when we actually cleared the residence, it's only a two-bedroom and one bedroom appeared to be what would be the mother's room . . . . And the room that was just to the north of that . . . it appeared to just be -- uh -- men's clothing -- as well as several different pairs of -- uh -- men's type tennis shoes and actually -- uh -- a lot of red and black which would be consistent with 59 Brim. That clothing was just stacked out -- I'm sorry, the shoes were stacked out on the floor."

Even if the affidavit's reference to 5/9 Brims gang colors in connection with shoes and/or clothes was the result of the police's alleged unlawful security sweep of the home, as defendant contends, we independently conclude that the search warrant was supported by other lawfully-obtained information to establish probable cause. (See *People v. Little* (2012) 206 Cal.App.4th 1364, 1371-1372 [noting that to "determine the existence of probable cause, [a court] consider[s] whether under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place' "].)

Here, Collins in connection with the affidavit stated that the African-American male in the market's surveillance video was identified as defendant; that defendant and his long-time girlfriend got into an argument with the victim when the victim touched defendant's girlfriend inappropriately; that the argument continued as they left the market and headed outside; that shortly thereafter the surveillance video showed a flash of light, indicative of a gunshot; that the victim was shot once in the leg, which was consistent

19

with witness testimony; and that the home they wanted to search was defendant's mother's and was located about a half mile from the location of the shooting. In addition, the police investigation of the shooting included witnesses who identified the shooter as being African-American. We independently conclude this information, obtained from a lawful independent source, is sufficient to support probable cause for the warrant.

As to the second prong, the record supports a finding that the police would have sought a warrant even without the alleged unlawful security sweep. (See *Weiss*, *supra*, 20 Cal.4th at pp. 1079, 1082.) The record shows the security sweep took place shortly after defendant was arrested and was conducted in order to secure the home of defendant's mother where the police believed defendant was then living. Moreover, the police had conducted surveillance of the home and witnessed defendant leaving the home in a car shortly before he was contacted and arrested.

What's more, the record shows when the police applied for a search warrant late on the same night of defendant's arrest, the police had two uniformed officers at the home securing it pending the issuance of the search warrant. Thus, we independently conclude there is sufficient evidence in the record to support the finding that police would have sought the warrant even if they had not done the security sweep. We therefore independently conclude the court properly denied defendant's motion to suppress evidence.

C. *Sufficiency of the Evidence for Simple Mayhem Conviction*

Defendant next contends the evidence is insufficient to support his mayhem conviction under section 203. This statute provides: "Every person who unlawfully and

maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

The record shows that with respect to the lesser-included offense of mayhem, the jury was instructed in part as follows with CALCRIM No. 801: "To prove that the defendant is guilty of mayhem, the People must prove that the defendant unlawfully and maliciously: [¶] 1. [p]ermanently disfigured someone. [¶] Someone acts *maliciously* when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to annoy or injure someone else. [¶] A disfiguring injury may be permanent even if it can be repaired by medical procedures."

Defendant contends the single gunshot wound to the victim's thigh was insufficient to show a permanent disfiguring injury as required by section 203.

For simple mayhem (as well as for aggravated mayhem), the disability or disfigurement must be "permanent." (*People v. Hill* (1994) 23 Cal.App.4th 1566, 1571 (*Hill*).) Permanence may be inferred from an injury's long duration. (See, e.g., *People v. Thomas* (1979) 96 Cal.App.3d 507, 512 [concluding a broken ankle causing disability lasting over six months was sufficient to support charge of mayhem], overruled on other grounds as stated in *People v. Kimble* (1988) 44 Cal.3d 480, 498.) The possibility of medical alleviation of an injury that would otherwise be permanent does not defeat a mayhem conviction. (*Hill*, *supra*, 23 Cal.App.4th at pp. 1572-1573.)

Here, the record includes various stipulations of the parties regarding the victim's injury: the victim "was shot on his right thigh and had a 0.5 centimeter entry wound on

21

the front of his thigh and [a] 0.5 centimeter exit wound on the back of his thigh"; "[t]here was a small collection of blood around the wound on the front of his right thigh"; "[t]here was no gross deformity"; the victim "had some chronic apparent swelling of the right medial ankle with a healed incision there"; and while still in the hospital recovering from his wounds, the victim "got up to go to the restroom and large amounts of blood seeped out of the wound on the back of his thigh." The record also shows when asked about his leg, the victim testified that it was "not doing well" and that he had "17 screws put into [his] leg."

Although we recognize that " 'not every visible scarring wound' may establish mayhem under section 203" (*People v. Santana* (2013) 56 Cal.4th 999, 1004), the evidence in the record before us supports the finding the victim's injury was permanent. Indeed, at the time of trial when the victim testified his leg was not doing well, it had been almost two years since the shooting. In addition, the victim had scarring on his thigh from the entry and exit of the bullet. (See *People v. Keenan* (1991) 227 Cal.App.3d 26, 35-36 [noting scars on a woman's breast caused by cigarette burns constituted permanent disfigurement even though the scars were located on a typically unexposed portion of her body].) We thus conclude this evidence is sufficient to support the finding that defendant was permanently disfigured for purposes of his mayhem conviction.

D. *Lesser-Included Instruction of Simple Possession*

Finally, defendant contends the court erred when it failed to give sua sponte an instruction on simple possession as a lesser-included offense of possession for sale.

22

It is beyond dispute that a trial court must instruct the jury on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses, whether or not the defendant makes a formal request. Instruction on a lesser included offense is required when there is evidence that indicates the defendant is guilty of the lesser offense but not of the greater. (*People v. Banks* (2014) 59 Cal.4th 1113, 1159.) Substantial evidence is evidence that a reasonable jury could find persuasive. (*People v. Benavides* (2005) 35 Cal.4th 69, 102 (*Benavides*).) The existence of any evidence, no matter how weak, will not justify instructions on a lesser included offense. (*People v. Whalen* (2013) 56 Cal.4th 1, 68.) In deciding whether there is substantial evidence we do not evaluate the credibility of the witnesses, a task for the jury. (*People v. Wyatt* (2012) 55 Cal.4th 694, 698.) We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

Simple possession of a controlled substance is a lesser included offense of possession of the same substance for sale. (See *People v. Becker* (2010) 183 Cal.App.4th 1151, 1157; *People v. Oldham* (2000) 81 Cal.App.4th 1, 16.) Therefore, if there was substantial evidence to show defendant was guilty of simple possession of Oxycodone, methamphetamine and Diazepam in counts 7, 8 and 10, respectively, but not possession

23

for sale, the court should have sua sponte instructed on the lesser offense of simple possession.[4]

Here, we independently conclude the court did not err in failing to instruct sua sponte the jury on the lesser included offense of simple possession in connection with counts 7, 8 and 10 because there was no substantial evidence in the record that a reasonable jury could find persuasive that defendant possessed these drugs for personal use. (See *Benavides*, *supra*, 35 Cal.4th at p. 102.) Indeed, the record shows defendant denied the safe, or the drugs found inside of it, belonged to him, and specifically denied taking Oxycodone. Thus, defendant's sole defense was the drugs (in connection with counts 7, 8 and 10) were not in his possession, much less for purposes of sale. If the jury believed defendant, they would have acquitted him of these charges, as opposed to merely finding him guilty of simple possession.

Moreover, our conclusion is further supported by the large amount of cocaine base, and the $28,500 of cash carefully bundled in black rubber bands, that were also found in the safe, and by the other drug paraphernalia police found inside the safe and bedroom including two digital scales with off-white residue on them, razors and multiple boxes of plastic baggies among other items. Such evidence does not support a finding

---

4    Defendant wisely does not contend the court erred in failing to instruct on the lesser included offense of simple possession in connection with his conviction on count 5 of possession for sale of cocaine base, in light of the fact he had roughly 3.7 pounds of the drug and in light of the fact the police found scales, razor blades and other drug paraphernalia with cocaine residue that is typically used in connection with drug sales.

defendant possessed the drugs in connection with counts 7, 8 and 10 merely for personal use.

## DISPOSITION

The judgment of conviction is affirmed.

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

25